**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JEAN MASSIE, *et al.,*        )
                                  )
          Plaintiffs        )
                                  )
          vs.                 )     Civil Action No. 06-1004
                                  )
U.S. DEPARTMENT OF HOUSING    )
AND URBAN DEVELOPMENT, and    )
ALPHONSO JACKSON, SECRETARY,   )
                                  )
          Defendants.      )

AMBROSE, Chief District Judge

## OPINION AND ORDER

Before me are Plaintiffs' and Defendants' cross-motions for summary judgment as well as an *amicus* brief by the National Housing Law Project and Housing Preservation Project filed on behalf of Plaintiffs. For reasons set forth in my opinion below, I am granting Defendants' motion (docket entry no. 103) and am denying Plaintiffs' motion (docket entry no. 106).

## I. Procedural History

The procedural history of this case relevant to the disposition of the cross-motions begins with an "emergency complaint" and a temporary restraining order ("TRO") filed by Plaintiffs on July 26, 2006.[1]  (Docket entry nos. 1 and 2).  I granted the TRO on July 27, 2006, received written submissions on the matter, held an injunction hearing on August 4, 2006 where live testimony and

---

[1] Plaintiffs are a class of residents of Third East Hills Park which, at one time, operated as a resident-owned housing cooperative. Each resident, upon entry to Third East Hills Park, had the opportunity to purchase an ownership interest in the property by becoming a shareholder in Third East Hills Park, Inc. ("TEHP"). The Plaintiffs claim they have been divested of their interests in TEHP. On October 1, 2007, I granted Plaintiffs' motion for class certification noting that the class consists of residents with fully-paid memberships as of the date of the notice of foreclosure (November 10, 2004). (Docket entry no. 70).

documentary evidence was submitted by all parties, and by August 9, 2006, denied the preliminary injunction.[2] (Docket entry nos. 3-5 and 12).

After Defendants moved to dismiss the Plaintiffs' Complaint, on January 19, 2007, I granted their motion under Pa.R.Civ.P. 12 (b)(1) for lack of subject matter jurisdiction on all but one count – Count IV – wherein Plaintiffs asserted a violation of 109 P.L. 115, §311. I dismissed Count IV under Pa.R.Civ.P. 12(b)(6) for failing to state a claim, thereby disposing of this matter and closing the case. (Docket entry nos. 13 and 33).

On January 29, 2007, Plaintiffs filed a motion for reconsideration. On March 1, 2007, after receiving Defendants' response, I granted Plaintiffs' request for reconsideration and ordered the Clerk of Courts to reopen the case. (Docket entry no. 40). On March 21, 2007, upon Defendants' motion, I clarified my March 1, 2007 order specifically identifying the only three surviving claims. They are: (1) HUD's alleged violation of 109 P.L. 115, §311; (2) HUD's violation of Plaintiffs' procedural due process rights as third party beneficiaries if HUD failed to provide Plaintiffs with the opportunity at the foreclosure hearing to provide factual objections to the foreclosure; and (3) HUD's failure to comply with its own regulations involving the management and disposition of the HUD-held mortgages on Third East Hills Park Property. (Docket entry no. 53).

Defendants filed the administrative record pertaining to this case on November 2, 2007 and filed a supplement to it on December 12, 2007. (Docket entry nos. 87 and 96). Defendants filed their motion for summary judgment, brief in support and concise statement of material facts on December

---

[2] Plaintiffs' request for a preliminary injunction suggested that HUD had determined that TEHP's Board was dysfunctional and had been since 2002. (Docket entry no. 11). Plaintiffs noted that HUD claimed TEHP failed to comply with maintenance requirements which TEHP was contractually obligated to do. (*Ibid*). Plaintiffs admitted that although HUD attempted to provide technical assistance to TEHP, HUD ultimately concluded that TEHP's Board lacked the capacity to adequately meet its ownership responsibilities. (*Ibid*). Plaintiffs suggested that as a result, HUD assumed mortgagee-in-possession status as of 2004. (*Ibid*).

26, 2007, while Plaintiffs filed their motion, brief and concise statement on December 27, 2006. (Docket entry nos. 103-105 and 106-108, respectively). Responses were filed by both sides to the other's Motions and reply briefs followed. (See, docket entry nos. 113, 115, 121 and 122). The National Housing Law Project and Housing Preservation Project sought and received permission to file an *amicus curiae* brief on behalf of Plaintiffs, to which Defendants responded. (Docket entry nos. 120 and 129). Thus, the summary judgment matters before me are now ripe for decision.

## II. Factual History

Plaintiffs, a class of former residents of Third East Hills Park housing development (hereinafter "the Property"), formed Third East Hills Park, Inc., a co-op (hereinafter, "Co-op"). (Docket entry nos. 105 and 116, ¶1). The Co-op entered into a Section 8 Housing Assistance Payments ("HAP") contract with HUD on September 13, 1976, and renewed the contract on May 24, 2001 for a term of 20 years. (Docket entry no. 87-5, bates pp. 95-106 and 115-130.)[3] The HAP contract required the Co-op to lease the units on the Property to eligible low-income families and to maintain and operate the housing units and related facilities in such a way so as to provide "decent, safe and sanitary housing." (Docket entry no. 87-5, bates pp.96, 100). When the HAP contract was renewed, the Co-op specifically warranted that the Property's units would be kept in decent, safe and sanitary condition and warranted that the units would "be maintained in such condition during the [20-year] term of the renewal contract." (Docket entry no. 87-5, bates p. 124).

_____

[3] The renewal contract renewed nearly all of the provisions found in the original HAP contract, except for: the identification of contract units by size and applicable contract rents, the amount of the monthly contract rents, contract rent adjustments, and the previously established project account (sometimes called, "HAP reserve" or "project reserve"). (Docket entry no. 87-5, bates no. 122). The renewal contract was to be "construed and administered in accordance with all statutory requirements and ... HUD regulations." Because the renewal contract renewed almost all of the provisions of the original HAP contract, this opinion will simply refer to the "HAP contract" or "contract"unless a distinction must be drawn.

3

The HAP contract required HUD to pay a portion of each eligible tenant's monthly rent when Co-op met these (and other) contractual obligations. (Docket entry no. 87-5, bates pp. 98-100, 122).

In order to determine if the Co-op was meeting its maintenance obligations, HUD, through its Real Estate Assessment Center ("REAC") and/or REAC contractors, performed inspections on the Property. (Docket entry no. 87-5, bates pp. 100-101). These inspections had to comply with various HUD regulations codified in the Congressional Federal Record.[4] (*See*, 24 CFR, Subtitle A,

---

[4]The original HAP contract reads, in pertinent part:
1.7 <u>Maintenance, Operation and Inspection</u>.

             \*        \*        \*

     b. <u>Inspection</u>.

             \*        \*        \*

       (2) [HUD] shall inspect or cause to be inspected each Contract Unit and related facilities at least annually and at such other times as may be necessary to ensure that the [Co-op] is meeting [its] obligation to maintain units in Decent, Safe, and Sanitary condition. ...

       c. <u>Units not Decent, Safe, and Sanitary</u>. If [HUD] notifies the owner that he has failed to maintain a dwelling unit in Decent, Safe, and Sanitary condition and the Owner fails to take corrective action within the time prescribed in the notice, [HUD] may exercise any of its rights or remedies under the Contract, including abatement of housing assistance payments, even if the Family continues to occupy the unit.

(Docket entry 87-5, bates p. 101). Similarly, the renewal contract (which renewed the above cited provisions of the original HAP contract) reads, in pertinent part:
     4. R<span style="font-variant:small-caps">enewal</span> C<span style="font-variant:small-caps">ontract</span>

             \*        \*        \*

     d. Purpose of Renewal Contract

             \*        \*        \*

       (2) Housing assistance payments shall only be paid to the [Co-op] for contract units occupied by eligible families leasing decent, safe and sanitary units from the [Co-op] in accordance with statutory requirements and with all HUD regulations ... If [HUD] determines that the [Co-op] has failed to maintain one or more contract units in decent, safe and sanitary condition and has abated housing payments to the [Co-op] for such units, [HUD] may use amounts otherwise payable to the [Co-op] pursuant to the Renewal Contract for the purpose of relocating or rehousing assisted residents in other housing.

(Docket entry no. 87-5, bates p. 122).
     In addition to these provisions which specifically discuss the inspection requirements for individual housing units and the abatement of housing assistance payments for units deemed by HUD to not be decent safe and sanitary, the original HAP contract also contains the following relevant provisions:

generally).

The parties agree that inspections took place on October 9, 2002, December 5, 2003 and September 22, 2004. (Docket entry nos. 105 and 116, ¶10). Defendant contends, and Plaintiffs do not dispute, that as a result of October 9, 2003, the Property received an inspection score of 53 points out of a possible 100. HUD sent the Co-op a written notice dated May 7, 2003 identifying the deficiencies noted during the October inspection, informing the Co-op that it was failing to comply with its contractual requirements to maintain the Property in a decent, safe and sanitary condition, and giving the Co-op sixty days to correct those deficiencies. (Docket entry nos. 105 and 116, ¶¶11 and 13).

The parties also agree that a reinspection of the Property took place on December 5, 2003 at which time the REAC awarded a score of 55 points out of a possible 100. (Docket entry nos. 105 and 116, ¶14). Defendants contend and Plaintiffs do not dispute that a report was prepared in connection with this inspection. (Docket entry nos. 105 and 116, ¶14).

Subsequently, HUD's Departmental Enforcement Center ("DEC") conducted a site visit on

---

2.7 Non-compliance by the [Co-op] under Contract.
      a. The [Co-op shall be found to be in non-compliance with the terms of this Contract if:
          (1) The [Co-op] has violated or failed to comply with any provision of, or obligation under, this contract or of any Lease;
          (2) The [Co-op] has asserted or demonstrated an intention not to perform some or all of [its] obligations under this Contract or under any Lease; ...
                    *         *         *
      b. Upon a determination by [HUD] that the [Co-op] is in non-compliance under the Contract, [HUD] shall notify the [Co-op] of (1) the nature of the non-compliance, (2) the actions required to be taken and the remedies to be applied on account of the non-compliance . . . and (3) the time within which the [Co-op] shall respond with a showing that it has taken all the actions required of [it]. If the [Co-op] fails to respond or take action to the satisfaction of [HUD], [HUD] shall have the right to terminate the Contract in whole or in part or take other corrective action to achieve compliance.
      c. The availability of any remedy under this Contract shall not preclude the exercise of any other remedy available under this Contract . . .
(Docket entry no. 87-5, bates p. 112).

June 22-23, 2004, inspecting all of the units inspected on December 5, 2003 as well as some additional randomly selected units, and noted numerous interior and exterior deficiencies. (Docket entry nos. 105 and 116, ¶¶16-19). Defendants contend and Plaintiffs do not dispute that the majority of the DEC's deficiency findings were "recurring issues from previous inspections." Similarly, the parties agree that by way of a July 12, 2004 written notice HUD informed the Co-op it had thirty days to conduct a survey of the deficiencies, correct them, then certify its compliance to HUD. (Docket entry nos. 105 and 116, ¶¶20-21). The notice also stated that if Co-op failed to take these actions, HUD would, without further notice, pursue any and all available remedies, including but not limited to abatement/suspension of the HAP contract and foreclosure. (Docket entry no. 87-4, bates pp. 76-78). The parties agree that following this notice, well after the thirty-day cure period had run, a reinspection of the Property took place on September 22, 2004 and resulted in a score of 43 out of possible 100 points.[5] (Docket entry no. 87-5, bates pp. 168-179).

Plaintiffs contend that on October 19, 2004, a conversation took place among various HUD representatives and two pages of handwritten notes bearing the October 19, 2004 can be found in the administrative record. (Docket entry no. 87-4, bates pp. 89-90). The notes contain phrases, not sentences, and the relevant portions of these notes read as follows:

> Third East Hills ...
>     REAC 50"c"
>     2nd score 50"c" recommended foreclosure ...
>      proceeding to foreclosure since in 50's ...
>     DEC inspection ... showed as dump

---

[5] Plaintiffs contend that all "exigent" health and safety deficiencies noted during the October 9, 2002 inspection, the December 5, 2003 inspection, the DEC's June 22-23, 2004 inspection, and the September 22, 2004 inspection were corrected within three business days of the inspection. As for the "non-exigent" deficiencies noted, Plaintiffs contend that some of the identified deficiencies did not exist, some were mischaracterized, and/or the severity or level of the deficiencies was difficult to determine. They also refer to internal HUD, handwritten notes dated October 14, 2004, which post-date each of these inspections. (Docket entry no. 116, ¶¶ 12, 14, 16-19, 24).

> poor physical contd
> issue notice on 236 agreement
> another failing REAC ... 43...
> Disfunctional Board, some problems w/ mgt agent ...
> Went to OHMAR - reqd new Bd w/ outside leadership
> HUD-held mortgage
>
> voucher out tenants, stop Sec 8
> relo language
> Sec 8 funds
> foreclose-City/PHA interested
>> units repairable
>> tax credit deal
> "technical default"
> not financial ...

(Docket entry no. 87-4, bates pp. 89-90).

On November 10, 2004, HUD sent a "notice of abatement" to the President of the Co-op explaining that because the Co-op had failed to "satisfactorily address" deficiencies sent in prior HUD notices (dated May 7, 2003 and July 12, 2004, which indicated the Co-op was in default on the HAP contract for failing to maintain the Property in a decent, safe and sanitary condition), HUD conducted a subsequent inspection (which was performed on September 22, 2004). (Docket entry no. 87-5, bates pp. 133-134).  The November 10, 2004 notice of abatement further explained that the September 22, 2004 inspection "confirmed" that the Property remained in an "unacceptable physical condition." (*Ibid*.)  This notice of abatement concluded that because the Co-op had failed to provide HUD with "any acceptable intended action to cure the HAP contract default," HUD had determined it would abate payments on <u>all</u> of the Property's housing units and forbade the Co-op from accepting new Section 8 tenants. (*Ibid*).

Plaintiffs, citing the HAP contract, contend that by issuing the November 10, 2004 notice of abatement, HUD acted without authority because it did not confirm that <u>each and every unit</u> on the

7

Property assisted under the HAP contract was not in decent, safe and sanitary condition. (Docket entry no. 116, ¶ 25, and docket entry 87-5, bates p. 101). Plaintiffs also assert that HUD could only abate payments on those units it did inspect. (*Ibid.*)

In addition to sending a notice of abatement to Plaintiffs on November 10, 2004, HUD sent Plaintiffs a "21-day hearing letter" placing the Co-op on notice that HUD would move to foreclose on the Property since the Co-op failed to maintain the Property in a decent, safe and sanitary condition. (Docket entry no. 87-5, bates pp. 188-189). This hearing letter also informed the Co-op that before foreclosure proceedings commenced, any resident could, within 21 days submit in writing a legal reason why HUD should not foreclose on the Property. (*Ibid*). In addition, the hearing letter also indicated that the Co-op could, within seven days of receipt of the letter, request a hearing and HUD would send a representative to hear any reasons why foreclosure should not occur. (*Ibid*).

On November 10, 2004, HUD also sent a memorandum to the Atlanta Multifamily Property Distribution Center recommending foreclosure on the Property. (Docket entry no. 87-5, bates pp. 135-187). The memo attached all of the prior inspection reports and additional documentation. (*Ibid*). One of the additional documents, entitled "Field Office Foreclosure Recommendation" contained a description of the Property and surrounding neighborhood conditions:

> Third East Hills Park [the Property] is part of three affordable housing developments located on continuous sites. East Hills Park Apartments and Second East Hills Park Apartments have been sold to profit-motivated developers who were awarded low income tax credits, and these properties are undergoing substantial physical improvements over the next three years. ... The current physical condition of [the Property] will negatively impact the success of the other two properties if ownership is not changed to an entity that will work positively with management.
>
>          *          *          *
>
> VII. FIELD OFFICE FORECLOSURE RECOMMENDATION
>
> It is the recommendation of the Pittsburgh Multifamily Program Center that the property be placed in foreclosure based upon technical defaults of the Housing

Assistance Payment Contract ...

As a final recommendation the Pittsburgh Multifamily Program Center strongly feels the area is heavily impacted with subsidized housing ... Thus, a total of 625 units in one area. Given the current occupied over-housed units at [the Property], it is this office's recommendation that the property be sold with the intention that some of the units will be demolished or downsized. We also recommend mixed housing with home ownership.

VIII. DISPOSITION RECOMMENDATION

The Pittsburgh Multifamily Program Center recommends the property be sold to the City of Pittsburgh through a negotiated sale.

(Docket entry no. 87-5, bates p. 142). When providing justification for the recommendations set forth above, HUD noted that, "[i]n recent conversations with Tom Cummings of the City of Pittsburgh Urban Redevelopment Authority, the City of Pittsburgh may be interested in a negotiated sale." (Docket entry no. 87-5, bates p. 143). It was also recommended that: (1) current eligible residents living on the Property be given vouchers based upon actual household composition and not current unit sizes, since most residents living at the Property were over-housed, and (2) the units located on the Property be demolished or converted to one or two-bedroom units "considering the heavily subsidized units already in the neighborhood." (*Ibid*).

In response to this submission/recommendation, HUD's Atlanta Multifamily Property Distribution Center requested a series of documents related to the Property's fiscal condition in connection with its referral for foreclosure. (Docket entry nos. 105 and 116, ¶27). In response, on February 9, 2005, Wallace and Associates Architects (who were retained by HUD), conducted a "Comprehensive Repair Survey Report and cost estimate estimating the total repairs" at $2,497,098.00. (Docket entry nos. 105 and 116, ¶28). By way of a Peer Analysis dated April 11, 2005, HUD determined that the repair costs and operating expenses exceeded the potential property income and "as-is value." (Docket entry no. 105, ¶29). Plaintiffs disagree with this analysis. (Docket

entry no. 116, ¶29).

The parties agree that on November 14, 2004 HUD sent a "notice of displacement" to each resident indicating that for "health, safety and security reasons" HUD determined to relocate all remaining Property tenants. (Docket entry no. 87-5, bates p. 194). This notice also informed the residents that a meeting regarding relocation would be held on December 2, 2004 and residents with executed leases would be reimbursed for moving expenses while income-eligible tenants would also receive a voucher for Section 8 rental assistance.[6] (*Ibid*). On February 10, 2005, HUD notified the residents of TEHP that HUD intended to foreclose on the Property. (Docket entry no. 87-7, bates pp. 252-253).

The Urban Redevelopment Authority of Pittsburgh ("URAP") informed HUD on March 4, 2005 it might be interested in purchasing the Property. (Docket entry no. 87-7, bates pp. 255-256). On April 20, 2005, HUD responded to URAP by stating that it would consider the sale of the property but informed URAP that because the HAP contract had been abated due to the physical condition of the Property and the relocation of the residents, the HAP contract would not be continued. (Docket entry no. 87-7, bates pp. 298-300).

It is undisputed that on June 20, 2005 HUD notified the residents that relocation assistance efforts would end on July 31, 2005 and that each resident needed to move out prior to that date in order to receive full relocation benefits. (Docket entry no. 87-7, bates pp. 298-300). The parties also agree that the June 20, 2005 notice informed residents that if they decided to relocate after July 31, 2005, they would still be eligible to receive a voucher, but would not receive any additional

---

[6] The parties concur that HUD placed a relocation consultant to assist residents with relocation, but by December 8, 2004, the president of the Co-op requested that this consultant move to an off-site location and the consultant relocated outside of the Property. (Docket entry nos. 105 and 116, ¶44).

relocation assistance. (Docket entry nos. 105 and 116, ¶51).

On March 10, 2006, HUD terminated the HAP contract. (Docket entry no. 96-2, bates p. 809). The parties agree that on May 31, 2006 HUD issued an internal memorandum regarding property distribution for fiscal year 2006. (Docket entry no. 35-2). The parties also agree that "Section V." of this memo described HUD's interpretation of the requirements of 109 P.L. 115, §311. (Docket entry nos. 105 and 116, ¶32). The relevant portions of Section V. of the memo read:

> ... [T]he Secretary is required to maintain the project-based Section 8 HAP contract in any multifamily property that the Secretary owns or for which the Secretary holds the mortgage and is in the process of disposing the property at foreclosure. To the extent that the Secretary determines that it is not feasible to continue such assistance for the property, based on the cost of maintaining such assistance or other factors, the Secretary, in consultation with the residents, may provide project-based Section 8 rental assistance at another existing property (or properties) or provide "other rental assistance." (See below under the Feasibility Analysis Section, if it is recommended that the Section 8 HAP contract should be terminated after the foreclosure sale.) Note: for properties where assistance under the project-based Section 8 HAP contract has been abated and the HAP contract has been or will be terminated upon completion of the relocation of all the residents, the Department will not offer the property with a HAP contract at the foreclosure sale.

(Docket entry no. 35-2, p. 4).

On June 9, 2006, HUD authorized payment of a $3,400,000.00 "up-front grant" to URAP if HUD acquired the Property through auction. (Docket entry no. 87-10, bates p. 544). On June 22, 2006, HUD notified the remaining residents that it planned to immediately sell the Property to URAP if it was able to acquire the Property at the foreclosure auction. (Docket entry no. 87-11, bates p. 550). This June 22, 2006 notice attached a copy of HUD's disposition plan which provided details about the transfer of title, and asked that written comments on the disposition plan be submitted to HUD within 30 days. (Docket entry no. 87-11, bates pp. 550-553). The attached plan indicated that residents would be reimbursed for reasonable moving expenses and that URAP would make an effort

to allow tenants to apply for readmission to Property after completing redevelopment. (Docket entry no. 87-11, bates pp. 552-553). Plaintiffs do not dispute that HUD never received any comments from residents with respect to the disposition plan, and admit that as of July 25, 2006 HUD issued the "final" disposition which contained identical provisions concerning relocation as those set forth in the initial June 22, 2006 plan sent to the residents. (Docket entry nos. 105 and 116, ¶¶62-63).

On July 5, 2006, HUD and URAP entered into a contract of sale for the Property should HUD obtain title at the foreclosure sale. (Docket entry no. 87-11, bates pp. 555-562). Rider 6 to this contract required URAP to: (1) relocate all remaining residents to alternative, decent, safe and sanitary housing within 12 months of the date of the contract, (2) comply with all relevant housing statutes and regulations, and (3) reimburse residents for reasonable moving expenses, including expenses associated with returning to the Property once redeveloped, and (4) provide advance written notice of any expected displacement. (Docket entry no. 87-11, bates pp. 576-577).

On October 26, 2006, HUD successfully purchased the Property during the foreclosure auction and immediately transferred it to URAP by special warranty deed which included Rider 6, referenced above. (Docket entry no. 87-11, bates pp. 751-752, 764-766, 798). The parties agree that as of October 26, 2006 and/or November 30, 2007, only 14 residents remained on the Property. (Docket entry nos. 105 and 116, ¶54).

### III. Standard of Review

Under F.R.Civ.P. 56, summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. F.R.Civ.P. 56(c) (2008). An issue of material fact is genuine only if the evidence is

such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The court must view the facts in a light most favorable to the non-moving party, and the burden of establishing that no genuine issue of material fact exists rests with the movant. *Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 192 (3d Cir. 2001) *citing, Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "[T]he existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against the moving party." *Ely v. Hall's Motor Transit Co.*, 590 F.2d 62, 66 (3d Cir. 1978) (quoting, *Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir. 1972)).

## IV. Analysis and Discussion

Both parties have moved for summary judgment on the only three remaining issues in this case: (1) whether HUD violated 109 P.L. 115, §311; (2) whether HUD failed to provide Plaintiffs with the opportunity at the foreclosure hearing to provide factual objections to the foreclosure and if so, whether this constitutes a violation of Plaintiffs' procedural due process rights; and (3) whether HUD failed to comply with its own regulations involving the management and disposition of the HUD- held mortgages on the Property.

### A. Violation of 109 P.L. 115, §311

Congress enacted Public Law 109-115, effective November 30, 2005, to make appropriations for the Departments of Transportation, Treasury, Housing and Urban Development, the Judiciary, District of Columbia, and independent agencies for the fiscal year ending September 30, 2006.[7]

---

[7] Based on House Report 109-153 (printed June 24, 2005) and Senate Report 109-109 (printed July 26, 2005), it is clear that the Congressional subcommittees recommended an increase in funding for HUD. The specific reasons why these subcommittees recommended the increase is discussed in greater detail below.

Section 311 of this law states in pertinent part:

> Notwithstanding any other provision of law, in fiscal year 2006, in managing and disposing of any multifamily property that is owned or held by the Secretary of [HUD], the Secretary shall maintain any rental assistance payments under Section 8 of the United States Housing Act of 1937 that are attached to any dwelling units in the property. To the extent the Secretary determines that such a multifamily property owned or held by the Secretary is not feasible for continued rental assistance payments under such section 8, based on consideration of the costs of maintaining such payments for that property or other factors, the Secretary may, in consultation with the tenants of that property, contract for project-based rental assistance payments with an owner or owners of other existing housing properties, or provide other rental assistance.

109 P.L. 115, §311 (2005).

Plaintiffs claim that Defendants failed to comply with this law because HUD did not maintain the Section 8 rental assistance payments which were "attached" to the dwelling units on the Property during fiscal year 2006 (which ran from October 1, 2005 through September 30, 2006).[8] (Plaintiffs' brief, p. 1). Plaintiffs, and the *amicus curiae,* also contend that because HUD did not terminate the HAP contract for the property at issue until March 10, 2006, Defendants were required to comply with 109 P.L. 115, §311.

Plaintiffs admit that between November 10 and 14, 2004, (more than a year before 109 P.L. 115 was enacted), HUD: (1) sent a "notice of abatement" to the President of the Co-op which explained that because the Co-op had failed to provide HUD with "any acceptable intended action to cure the HAP contract default," (referencing the Co-op's failure to maintain the Property in a decent, safe and sanitary condition), HUD had determined it would abate payments on <u>all</u> of the

---

[8] As noted in my March 7, 2007 opinion and order in this matter, 109 P.L. 115 does not define the term "attached." Once again, the parties failed to provide any case law interpreting this term in §311. Where a statute does not define a relevant term, as is the case here, a court looks to its ordinary meaning. *See e.g. Rousey v. Jacoway*, 544 U.S. 320, 326 (2005). This may include the use of dictionary definitions. *Id.* The Random House College Dictionary, Revised Edition, defines the word, "attach" as "to fasten or affix; join; connect."

Property's housing units and forbade the Co-op from accepting new Section 8 tenants; (2) sent Plaintiffs a "21-day hearing letter" placing the Co-op on notice that it would move to foreclose on the Property because the Co-op failed to maintain the Property in a decent, safe and sanitary condition; (3) sent Plaintiffs a "notice of displacement" indicating that for "health, safety and security reasons" it had determined to relocate all remaining Property tenants; and (4) sent a memorandum to the Atlanta Multifamily Property Distribution Center recommending foreclosure on the Property and attached all of the prior inspection reports and additional documentation.

Plaintiffs do not dispute that as of the date of the notice of abatement (November 1, 2004), HUD did, in fact, abate all HAP payments on all units located on the Property owned by the Co-op.[9]

In my view, since all rental assistance payments had been abated on all units as of November 10, 2004, in fiscal year 2006, the Property at issue in this case had no rental assistance payments "attached" to any of its units. Accordingly, even if the Property was "owned by the Secretary" of HUD during fiscal year 2006, because there were no rental assistance payments attached to any units located on the Property, the Secretary had no such payments to "maintain" during fiscal year 2006.

Plaintiffs and the *amicus* disagree with this position, and argue that the abatement date for the rental assistance payments is of no moment. Instead, they contend that the crucial date is March 10, 2006 when the HAP contract was terminated. In addition, the *amicus* argues that §311 would be rendered moot every time HUD took ownership of a property, because HUD's ownership of a property automatically triggers abatement of all rental assistance payments, leaving no units with

---

[9] While Plaintiffs' response to Defendants' concise statement of material facts challenges the propriety of the Defendants decision to abate all rental assistance payments on all units located on the Property, this argument is not briefed. If it had been fully briefed, it would be a moot argument at this juncture since the argument essentially asserts that Defendants breached the HAP contract by abating payments on every unit, not just those it inspected and deemed indecent, unsafe and not sanitary. Whether Defendants breached the HAP contract is not an issue presently before me, and is clearly a legal argument which could have been raised at the foreclosure hearing.

rental assistance payments attached to them.[10]

Defendants concur that although Congress generally intended for 109 P.L. 115, §311 to preserve Section 8 rental assistance payments, they note that the overall Congressional intent related to Section 8 housing program does not support rewarding owners who allow their properties to become indecent, unsafe and unsanitary by continuing those payments. Given the fact that HUD deemed the conditions of the Property at issue to be so indecent, unsafe and unsanitary that it abated all rental assistance payments, Defendant argues that it does not follow that Congress would mandate a continuation of the rental assistance payments on this Property.

The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 843 n.9, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984). In *Yusupov v. AG of the United States*, 518 F.3d 185 (3d Cir. 2008), the Third Circuit explained that *Chevron* involves a two-step inquiry: Step one, the court must determine "whether Congress has directly spoken to the precise question at issue" and "unambiguously expressed [its] intent." *Yusupov,* 518 F.3d at 197 *citing Chevron*, 467 U.S. at 842-43. If so, the inquiry ends, as both the agency and the court must give effect to the plain language of the statute. *Id., citing Chevron* at 43, n.9

When "the statute is silent or ambiguous with respect to the specific issue," the court proceeds to step two, where it inquires whether the agency's "answer is based on a permissible construction of the statute." *Id.* at 843. "If a statute is ambiguous [or silent], and if the implementing

---

[10] The Plaintiffs previously argued that HUD was a mortgagee-in-possession during the time period in question, not an owner. (*See*, Docket Entry no. 11, Plaintiffs' brief in support of its motion for the TRO). The *amicus* brief labels HUD as an "owner" and no party briefed the distinction. Nevertheless, I find this issue to be moot based on my analysis of the plain meaning of 109 P.L. 115, §311 as applied to the facts of this case.

agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980, 125 S. Ct. 2688, 162 L. Ed. 2d 820 (2005) (*citing Chevron*, 467 U.S. at 843-44 & n.11).

Step one of the *Chevron* analysis requires me to determine whether the Congressional intent behind 109 P.L. 115, speaks directly to the precise question at issue: *i.e.,* whether Congress intended HUD to continue to make rental assistance payments for dwelling units which once received rental assistance payments. While I think the plain meaning of §311 clearly does not require HUD to do so, the *Chevron* analysis is warranted. A review of the relevant portions of House Report 109-153 and Senate Report 109-109 are instructive in this regard. *See*, 109 H. Rpt. 153 (June 24, 2005) and 109 S. Rpt. 109 (July 26, 2005).

In both of these reports, the House and Senate subcommittees recommended an increase in funding for HUD and provided rationale as to why funding should be increased. The House report notes that "[o]ver the past five years, [the Appropriations Committee] has demonstrated the high priority it places on housing and community development programs by providing significant additional resources to the Department at a time of fiscal constraint." Importantly, the House report also indicates that the increase in funding has been done to, "...[complete] the transition of the appropriations for this program from a "unit-based" system back to a "budget-based" program as the program has historically operated."

Similarly, the Senate report indicates, "[t]he Committee is optimistic that the budget-based approach will ensure a more rigorous rent policy and fiscally responsible approach." However, the Senate report also reads, "[t]he Committee also remains concerned that HUD is not committed to

maintaining section 8 project-based housing and may be encouraging owners to opt out of the program. This would be a tremendous mistake since affordable housing needs are growing while the stock of affordable low-income housing is shrinking."

Although neither report specifically explains Congress' intent behind §311 of 109 P.L. 115, and neither report "directly speaks to the precise question at issue" as step one of *Chevron* requires, the reports clearly recommend increased funding to assist HUD complete its transfer from a unit-based to a budgetary-based program. Based on a full reading of the relevant portions of these reports, it is clear that the House and Senate believed that this shift would aid HUD in achieving greater fiscal responsibility while enabling it to better meet its public service goals. The statement found in the Senate report (quoted above) about Section 8 housing seems to caution HUD not to encourage owners to opt out of Section 8 housing in an effort to meet the overall goal of shifting from a unit-based to a budget-based program.

Since the overall Congressional intent with respect to enacting 109 P.L. 115 clearly focused on giving HUD a funding increase during a time of fiscal constraint to enable it to complete its transfer from a unit-based to a budget-based program (thus, rendering the Agency more fiscally efficient), the intent behind the promulgation of §311 would have been to further this overall goal. It is possible to interpret §311 as an attempt to complete the phase-out of a unit-based program, ("[HUD] shall maintain any Section 8 rental assistance payments under Section 8 ... that are attached to any dwelling units...") without HUD encouraging any owners to opt out of the section 8 program. However, considering that the overall point behind 109 P.L. 115 was to provide a funding increase to HUD in order to help HUD transition away from the unit-based program, it is counterintuitive to assume that §311 would require HUD to maintain rental assistance payments which were not

attached to dwelling units as of the effective date of the law.

Accordingly, the Congressional intent of 109 P.L. 115, §311 should be read in such a way as to be consistent with the overall intent of 109 P.L. 115 which required HUD to continue making rental assistance payments only for those units where such payments attached. Under the facts of this case, abatement of those payments occurred in 2004, and thus no payments were "attached" to the units in fiscal year 2006.[11]

Even if step one of *Chevron* were not met based on my interpretation of the Congressional record with respect to 109 P.L. 115, §311, step two of the *Chevron* analysis requires me to defer to the implementing agency's construction, if it is reasonable, even if the agency's reading differs from what the court believes is the best statutory interpretation. In this case, the agency's interpretation of §311 relies in part on its issuance of the "Multifamily Housing Memo." (*See*, docket entry no. 35-2). As noted above in the Factual History portion of my opinion, the parties <u>agree</u> that "Section V." of this memo described HUD's interpretation of the requirements of 109 P.L. 115, §311.

Section V. of the memo generally required HUD to maintain HAP contracts for any property HUD owned or held the mortgage, which would have included the Property at issue in this case, but for the one caveat noted in this same section.  Under Section V. HUD did not have to maintain the project-based Section 8 HAP contract for properties where assistance under the contract had been abated <u>and</u> where the contract would be terminated upon completion of the relocation of all the residents. This caveat also specifically stated, "the Department will not offer the property with a HAP contract at the foreclosure sale." (*See*, docket entry no. 35-2). Thus, it is clear that the Property

---

[11] I also concur with Defendants that Congress would not have intended for HUD to continue to spend its budgetary allowance on rental assistance payments on units that were in such a state of disrepair so as to be deemed not decent, not safe and not sanitary.

at issue falls within the memo's exception and HUD, as the implementing agency, concluded that it did not have to extend rental assistance payments on the units at issue in this case . Under *Chevron* and in light of the entirety of my foregoing analysis, I find HUD's interpretation of §311 to be reasonable and controlling.

Based on my analysis of the evidence presented and the legal statutory interpretation requirements, I find that Defendants did not violate 109 P.L. 115, §311 and summary judgment will be entered in their favor on this issue.

### B.  Management and Disposition Regulations

Plaintiffs generally assert that HUD failed  to comply with its own regulations involving the management and disposition of the HUD-held mortgages on the Property. Specifically, Plaintiffs claim can be summarized as follows: HUD failed to: (1) reasonably preserve the Property, (2) minimize the displacement of residents, (3) provide relocation assistance to displaced class members at levels described in the Uniform Relocation Act.  (Docket entry 107 p.  7). Defendants disagree with each of these claims.

Plaintiffs rely on 12 U.S.C. §1701z-11 in making their first assertion – HUD had a duty to preserve the Property and  failed to do so in violation of its own regulations.  The relevant portion of Title 12 reads:

> (d) Management and maintenance of properties.
>
> *       *       *
>
> > (2) Maintenance of projects owned by Secretary. In the case of multifamily housing projects that are owned by the Secretary (or for which the Secretary is mortgagee in possession), the Secretary shall--
> >
> > > (A) to the greatest extent possible, maintain all such occupied projects in a decent, safe, and sanitary condition and in compliance with any standards under applicable State or local

> laws, rules, ordinances, or regulations relating to the physical
> condition of the housing and any such standards established
> by the Secretary;
> (B) to the greatest extent possible, maintain full occupancy in
> all such projects; and
> (C) maintain all such projects for purposes of providing rental
> or cooperative housing.

12 USCS § 1701z-11 (2008). Plaintiffs further assert that as a direct result of HUD's failure to maintain the Property, it failed to minimize displacement of the residents, which, undermines one of the goals of the statute (12 U.S.C. §1701z-11(a)).[12]

The parties agree that the Co-op, as the owner of the Property, was contractually obligated to maintain the Property in a decent, safe and sanitary condition. Evidence exists that Plaintiffs clearly failed to do so. As a result, HUD abated all rental assistance payments to the Co-op on

---

[12] **§ 1701z-11. Management and disposition of multifamily housing projects**

(a) Goals. The Secretary of Housing and Urban Development shall manage or dispose of multifamily housing projects that are owned by the Secretary or that are subject to a mortgage held by the Secretary in a manner that--
(1) is consistent with the National Housing Act and this section;
(2) will protect the financial interests of the Federal Government; and
(3) will, in the least costly fashion among reasonable available alternatives, address the goals of--

> (A) preserving certain housing so that it can remain available to and affordable by low-income persons;
> (B) preserving and revitalizing residential neighborhoods;
> (C) maintaining existing housing stock in a decent, safe, and sanitary condition;
> (D) minimizing the involuntary displacement of tenants;
> (E) maintaining housing for the purpose of providing rental housing, cooperative housing, and homeownership opportunities for low-income persons;
> (F) minimizing the need to demolish multifamily housing projects;
> (G) supporting fair housing strategies; and
> (H) disposing of such projects in a manner consistent with local housing market conditions.

In determining the manner in which a project is to be managed or disposed of, the Secretary may balance competing goals relating to individual projects in a manner that will further the purposes of this section.

12 USCS § 1701z-11 (2008).

November 10, 2004, which was a right afforded to HUD by the HAP contract terms. Nothing in the HAP contract at issue, (nor in any statutory or regulatory laws), indicates that if and when HUD abates rental assistance payments it assumes the responsibility for maintenance of the Property. In fact, HUD and the Co-op remained contractually bound until March 10, 2006, when HUD terminated the contract. Thus, the contract terms, which were in full force and effect until March 10, 2006 obliged the Co-op – not HUD – to continue to maintain the Property in a decent, safe, and sanitary condition. Thus, Plaintiffs' first specific argument (that HUD failed to properly maintain the Property) fails.

Second, Plaintiffs assert that HUD failed to minimize the displacement of residents in part due to its lack of maintenance of the Property. Since HUD had no duty (contractually or otherwise) to maintain the Property, the portion of Plaintiffs' displacement argument which relies on this maintenance premise fails. The remaining portion of Plaintiffs' argument turns on the definition of "displacement."

Pursuant to regulations governing the Uniform Relocation Assistance Act, a "displaced person" is defined as:

> (9) Displaced person.
>> (i) General. The term displaced person means, except as provided in paragraph (a)(9)(ii) of this section, any person who moves from the real property or moves his or her personal property from the real property.
>> *　　*　　*
>> (ii) Persons not displaced. The following is a nonexclusive listing of persons who do not qualify as displaced persons under this part:
>
> *　　*　　*
>
>> (D) A person who is not required to relocate permanently as a direct result of a project. Such determination shall be made by the Agency in accordance with any guidelines established by the Federal Agency funding the project (See appendix A, § 24.2(a)(9)(ii)(D));

49 CFR 24.2 (9)(ii)(D).

Under the facts of this case, the parties agree some residents relocated outside the Property as a result of HUD's November, 2004 notices. Other residents relocated as a result of the foreclosure on the Property. The November 14, 2004 notice informed the residents that HUD had deemed relocation necessary due to "health, safety and security" concerns, and expressed HUD's "hope" that people would relocate using the assistance HUD provided but also expressed it was the resident's choice. This leaves the 14 remaining residents who constitute the class of Plaintiffs in this class. Importantly, the Plaintiffs do not assert they have been "required" to relocate from the Property. To the contrary, the documentary evidence of record clearly illustrates HUD's efforts via its final disposition plan, as well as its contract and a Memorandum of Understanding with URAP. The final disposition plan required URAP to make an effort to allow tenants to apply for readmission to the Property after completing redevelopment. The HUD-URAP contract and Memorandum of Understanding required URAP to provide temporary on-site housing for any remaining residents who chose not to relocate during the demolition and construction of the re-developed Property.

The residents and former residents of the Property (which include Plaintiffs) are defined as "persons not displaced" as defined by 49 C.F.R. 24.2(9)(ii)(D) because they were not "required ... to relocate." Accordingly, Plaintiffs' second assertion (that HUD failed to minimize the displacement of residents) is without merit.

The third and final assertion by Plaintiffs suggests that HUD failed to provide relocation assistance to displaced class members at levels described in the Uniform Relocation Act ("URA"). Clearly, this claim turns on whether the URA applies to this case. Since I have already determined

that Plaintiffs are not "displaced persons" as defined by one of the many regulations governing the URA, application of the URA cannot be triggered via the definition since Plaintiffs fall outside the URA "displaced persons" definition. Additionally, the URA does not apply because the Co-op, not HUD, bore the responsibility for maintaining the Property in a decent, safe and sanitary condition, which resulted in the relocation of the residents.

This leaves Plaintiffs' argument that HUD failed to comply with 24 C.F.R. 290.17(d). Under 24 C.F.R. 290.17(d), Plaintiffs argue that HUD owed the residents relocation at URA levels. However, 24 C.F.R. 290.17(c) states as follows:

> (c) **Relocation assistance at <u>non</u>-URA levels**. **Whenever** the **displacement** of a residential tenant (family or individual) **occurs** in connection with the management or disposition of a multifamily housing project, but is not subject to paragraph (d) of this section (*e.g.*, occurs **as a direct result of** HUD repair or demolition of all or a part of a HUD-owned multifamily housing project or as a direct result of **the foreclosure of a HUD-held mortgage on a multifamily housing project** or sale of a HUD-owned project without federal financial assistance), **the displaced tenant shall be eligible for the following relocation assistance**:
>
> > (1) Advance written notice of the expected displacement shall be provided at least 60 days before displacement, describe the assistance and the procedures for obtaining the assistance, and contain the name, address and phone number of an official responsible for providing the assistance;
> >
> > (2) Other advisory services, as appropriate, including counseling, referrals to suitable (and where appropriate, accessible), decent, safe, and sanitary replacement housing, and fair housing-related advisory services;
> >
> > (3) Payment for actual reasonable moving expenses, as determined by HUD; and
> >
> > (4) Such other federal, State or local assistance as may be available.

24 C.F.R. 290.17(c). (Emphasis added).

Under the facts of this case, HUD relocation assistance requirements clearly fell into the

non-URA category described in subpart (c) of the regulation, not the URA-level found in subpart (d). Plaintiffs' reliance on subpart (d) is misplaced because, once again Plaintiffs do not meet this regulation's definition of "displaced person[s]."

Under 24 C.F.R. 290.17(d)(3), a displaced person is defined as "any person that moves from the real property ... permanently, as a direct result of acquisition, rehabilitation or demolition for a federally assisted project." HUD's November 10 and 14, 2004 notices to Plaintiffs, which preceded and prompted the foreclosure of the Property, were not issued to further a federally assisted project. Rather, they were issued because of the indecent, unsafe and unsanitary conditions of the premises. The November 14, 2004 notice of displacement specifically cites "health, safety and security" concerns as the basis for the issuance of the notice. Moreover, the evidence of record shows that HUD abated all rental assistance payments and terminated the HAP contract (November 10, 2004 and March 10, 2006 respectively) before HUD published its final disposition plan and before HUD and URAP entered into their contract and memorandum of understanding (June 22, 2006 and July 25, 2006, respectively). Accordingly, I find no evidence which could support Plaintiffs contention that they were entitled to the URA level of assistance. Thus, I find that Defendants did not violate any management or disposition regulations, and judgment will be entered in favor of Defendants on this claim.

### C. Plaintiffs' Procedural Due Process Rights

Plaintiffs claim HUD failed to provide them with the opportunity at the foreclosure hearing to provide factual objections to the foreclosure and in so doing, violated their procedural due process rights. Plaintiffs suggest that this claim, which provides an alternative basis for relief, is relevant only if I dispose of the preceding claims, which I have. As a result, I now review this claim.

Plaintiffs contend that HUD failed to provide them with an opportunity for a hearing in compliance with the Fifth Amendment and the Administrative Procedures Act. Plaintiffs explain that each member of the class had an ownership interest in the Property as a shareholder in the Co-op, as well as leasehold interests in the Property.

On December 4, 2007, Plaintiffs filed a motion for approval of stipulation. The motion indicated that Plaintiffs had negotiated with URAP and Third East Hills Limited Partnership ("TEHLP" – the entity which gained title to the Property immediately subsequent to URAP taking title following HUD's successful bid at the foreclosure auction). The motion also explained that due to the nature and outcome of the negotiations, the Plaintiffs were guaranteed "certain benefits" and would no longer seek to "regain title to the Property ... or otherwise seek relief which would jeopardize TEHLP's title or ability to redevelop the property. ... [But] Plaintiffs continue ... to seek ...relief regarding Defendants' failure to provide ... continued project-based rental assistance ... following the foreclosure and Defendants' withholding of relocation assistance and benefits to class members required under its regulations ...". Plaintiffs simultaneously filed a "stipulation of non-interference" in connection with this motion, and on December 4, 2007 I entered an order granting plaintiffs' motion. (Docket entry nos. 93 and 95).

Based on statements set forth in both their motion and stipulation, Plaintiffs waived any right they may have had to claim a violation of due process. Should Plaintiffs have been denied due process under either the Constitution or the Administrative Procedures Act, Plaintiffs have foregone the remedies they may have been entitled to in exchange for the "certain benefits" they received from TEHLP. Accordingly, I will enter judgment in favor of Defendants on this final issue as well.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JEAN MASSIE, et al.,                              )
                                                  )
         Plaintiffs                  )
                                                  )
       vs.                              )      Civil Action No. 06-1004
                                                  )
U.S. DEPARTMENT OF HOUSING                        )
AND URBAN DEVELOPMENT, et al.,                    )
                                                  )
        Defendants.                  )

AMBROSE, Chief District Judge

## <u>ORDER</u>

AND now, this 26th day of September, 2008, for the reasons set forth in the accompanying Opinion, it is hereby ordered that Plaintiffs' Motion for Summary Judgment [Doc. No. 106] is denied and Defendants' Motion for Summary Judgment [Doc. No. 103] is granted.  A separate Order will follow entering Judgment in favor of Defendants.

                BY THE COURT:

                s/ <u>Donetta W. Ambrose</u>
                   Donetta W. Ambrose,
                   Chief U.S. District Judge